UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                :

SANTANDER CONSUMER USA, INC.,     :
                                :

                  Plaintiff,     :

                                :        21-CV-8529 (VSB)

         - against -          :

                                :        **OPINION & ORDER**

THE CITY OF NEW YORK, *et al.*,     :

                                :

                Defendants.     :

                                :
--------------------------------------------------------X

<u>Appearances</u>:

Nicholas A. Duston
Benjamin D. Schwartz
Norris McLaughlin, P.A.
New York, NY
*Counsel for Plaintiff*

Edward L. Murray
Samantha M. Schonfeld
Genan F. Zilkha
New York City Law Department
New York, NY

Annette Marie Lalic
United States Equal Employment Opportunity Commission
New York, NY
*Counsel for Defendant City of New York*

<u>VERNON S. BRODERICK</u>, United States District Judge:

       Defendant the City of New York (the "City") operates an "Arterial Tow Program" which

allows permittees to tow vehicles from certain parkways, expressways, thruways, and bridges in

New York City (collectively, "Arterial Highways") to ensure public safety and ease congestion.

Private tow companies, including Defendant Universe Towing Inc. ("Universe"), can apply for a

permit to participate in the New York City Police Department's ("NYPD") Arterial Tow

Program. *See* Rules of the City of New York tit. 6 § 2-370, tit. 34 § 4-07(i); N.Y.C. Admin.

Code § 20-519(b)(1). Under the Arterial Tow Program, tow companies tow "stolen, abandoned,

and disabled vehicles on one or more of sixteen segments of Arterial Highways in New York

City." (Doc. 67 ("Def. 56.1") ¶ 4.) After a vehicle is towed, the NYPD and the Arterial Tow

permittee are required to notify registered owners of the vehicle that the vehicle has been towed

and the procedures for obtaining the vehicle. (*Id*. ¶¶ 10–11.) If a vehicle remains unclaimed at

an Arterial Tow Program permittee's storage facility eight to thirty days after towing the vehicle

to its storage facility, "the permittee must transfer the vehicle to the NYPD Property Clerk," who

then "provides notice to all parties with an interest in the vehicle, including lienholders." (*Id*. ¶¶

12–13.) Lienholders on the towed vehicles may reclaim the vehicles by paying various towing

and storage fees. (*Id*. ¶ 16.)

Plaintiff Santander Consumer USA, Inc. ("Santander" or "Plaintiff") is "an automotive

finance company in the regular business of taking assignments of retail installment contracts

relating to the purchases of motor vehicles . . . and holding liens in the vehicles to secure

payment under those contracts." (Doc. 61 ("Pl. 56.1") ¶ 1.) Plaintiff held a perfected security

interest in a 2019 Kia Sportage (the "Vehicle") pursuant to an installment contract with third-

party defendant[1] Justina Lloyd ("Lloyd"). (*Id*. ¶¶ 3, 7.) On October 26, 2020, the Vehicle was

involved in an accident and was abandoned by its driver. (*Id*. ¶ 12.) At the request of the NYPD,

Universe towed the Vehicle pursuant to the City's Arterial Tow Program. (*Id*. ¶¶ 13–14.)

Santander was not notified of the tow until nearly eight months later, on June 22, 2021, when

Universe notified Santander using a letter dated June 18, 2021, sent through the mail, that the

---

[1] It does not appear that Lloyd was served with the Third-Party Complaint. *See infra* § IV.B.

Vehicle was towed to its storage facility. (*Id*. ¶ 15.) Universe conditioned Santander's repossession of the Vehicle on payment of storage, towing, impound, and administration fees. (*Id*. ¶ 17.)

Santander then brought this action against the City and Universe, asserting various federal and state constitutional claims against Defendants related to the operation of the City's Arterial Tow Program. (*See* Doc. 1 ("Compl." or "Complaint").) Before me are Plaintiff's motion for summary judgment against the City and the City's motion for summary judgment against Plaintiff.

For the reasons that follow, I conclude that the Arterial Tow Program violates Plaintiff's due process rights under the Fourteenth Amendment, but not its Fifth Amendment rights against uncompensated takings or its Fourth Amendment rights against unwarranted seizures. As a state actor, the City is liable for the due process violation. Therefore, the motions are GRANTED in part and DENIED in part. Specifically: (1) Plaintiff's motion for summary judgment is GRANTED with regard to the due process claim against the City and otherwise DENIED and (2) the City's motion for summary judgment is GRANTED with regard to Plaintiff's Fourth and Fifth Amendment claims.

## I.    **Factual Background**[2]

### A.  *The City's Arterial Tow Program*

New York City law provides that a disabled vehicle must be "removed expeditiously" from the road so as not to block the flow of traffic. Rules of the City of New York tit. 34 § 4-08(a)(8). Under the NYPD's Arterial Tow Program, a private tow truck operator may apply for a permit to tow disabled vehicles from certain highways, including Franklin Delano Roosevelt

---

[2] The underlying facts are undisputed unless otherwise noted.

Drive ("FDR Drive").  *See id*. tit. 6 § 2-370, tit. 34 § 4-07(i); N.Y.C. Admin. Code § 20-519(b)(1).  Generally, an Arterial Tow permittee may only tow away a vehicle if it first completes an "Authorization to Tow" form.  (Def. 56.1 ¶ 6.)  When a vehicle is abandoned and the "person in charge of the vehicle is not present," "the Police Officer or Traffic Enforcement Agent who directs the removal of the vehicle" must sign the "Authorization to Tow" form before the Arterial Tow permittee may tow a vehicle away.  (*Id.* ¶¶ 6–7.)  This Officer or Agent may check a box on the Authorization to Tow form indicating if the vehicle is "abandoned."  (*Id.* ¶ 8.)  Once the form is complete, the Arterial Tow permittee will tow the vehicle to its storage facility.  (*Id.* ¶ 9.)

After the Arterial Tow permittee has towed and stored the vehicle, the NYPD sends the registered owner of the vehicle a "Rotation-Tow Owner Notification," which states that the vehicle has been towed and explains how the owner can retrieve the vehicle.  (Def. 56.1 ¶ 10.)  The Arterial Tow permittee is also required to send a notice to the registered owner that the vehicle was towed.  (*Id.* ¶ 11.)  The NYPD does not send this initial notice to any person or entity holding a lien on the vehicle while the vehicle is stored at the Arterial Tow permittee's storage facility.  (*See id.* ¶ 13; Pl. 56.1 ¶¶ 22–23.)  Between eight and thirty days after storing a vehicle, the Arterial Tow permittee must "transfer any vehicle which has not been claimed into the custody of the police department property clerk."  N.Y.C. Admin. Code § 20-519(b)(1); *see also* Def. 56.1 ¶ 12.  "Typically, within one week of a vehicle being transferred to the NYPD, the [NYPD] Property Clerk provides notice to all parties with an interest in the vehicle, including lienholders that the vehicle is currently being held by the NYPD Property Clerk."  (Def. 56.1 ¶ 13.)  This notice states:

> You have fifteen (15) days from the date of this notice to claim your vehicle.  If you fail to claim your vehicle in fifteen (15) days, it will be deemed abandoned and

will become property of New York City.  The vehicle will be sold at auction or otherwise disposed of[.]

(Doc. 70-4 at 72.)  The notice provides that the City will auction the vehicle unless the vehicle is redeemed by paying the requisite fees.  (*Id.*)  Thus, the City only provides notice of a tow to a lienholder after a vehicle is transferred from an Arterial Tow permittee's storage facility to the NYPD Property Clerk.

For a lienholder to claim a vehicle from the NYPD Property Clerk, it "must provide the following documents to the NYPD:  (1) copy of the vehicle title; (2) a notarized copy of a conditional sales contract or agreement; (3) a notarized letter describing the details of the default of the sales contract or agreement; and (4) a letter holding the City harmless for release of the vehicle 'and authorizing a party to tow the vehicle from the NYPD pound.'"  (Def. 56.1 ¶ 15 (quoting Doc. 70-4 ("Zegilla Decl.") ¶ 18).)  Additionally, "[c]laimants must pay the NYPD $178.56 to cover the costs of the tow operator's services and a $5 per day storage fee from the date the vehicle is transferred to the NYPD Property Clerk to the date the vehicle is claimed."  (*Id.* ¶ 16.)

Vehicles that are unclaimed within the relevant timeframe "are auctioned by private vendors and proceeds from the auction of the vehicle are used to pay towing, storage, and auction costs."  (Def. 56.1 ¶ 17.)  If an unclaimed vehicle is auctioned, the "NYPD Property Clerk notifies all lienholders regarding the sale of the vehicle and procedures for recovering any proceeds."  (*Id.* ¶ 18.)  Finally, any remaining sale proceeds are deposited in the City's general fund.  (*Id.* ¶ 19.)

### B.  *The Seizure of the Vehicle*

Plaintiff held a lien and perfected security interest in the Vehicle pursuant to Lloyd's purchase of the Vehicle under an installment contract.  (Pl. 56.1 ¶¶ 3–7.)  On October 26, 2020,

the NYPD responded to an accident involving the Vehicle at the FDR Drive and East 30th Street. (Def. 56.1 ¶ 20.)  The Vehicle was abandoned by its driver.  (Pl. 56.1 ¶ 12.)  Universe is the designated Arterial Tow permittee to tow vehicles from the segment of the FDR Drive where the accident involving the Vehicle occurred.  (Def. 56.1 ¶ 22.)  An NYPD officer present at the scene of the accident requested and authorized Universe to tow the Vehicle to Universe's storage facility.  (*Id*. ¶ 23.)  The City does not dispute that it did not obtain a warrant or other court order relating to the towing of the Vehicle or its turnover of possession to Universe.  (Doc. 68 ("Def. Response to Pl. 56.1") ¶ 20.)  Nor was there any hearing "relating to the propriety of the towing of the Vehicle, its turnover of possession to Universe, Universe's continued possession of the Vehicle, or Universe's request for payment in exchange for possession of the Vehicle, and [the City] denies that it is legally obligated to have a regular policy or custom of doing so."  (Pl. 56.1 ¶ 21.)

Plaintiff learned that the Vehicle was seized when it received a letter from Universe on June 22, 2021, approximately eight months after the Vehicle was impounded on October 26, 2020.  (Pl. 56.1 ¶ 15.)  The City did not provide any notice to the owner of the Vehicle, or any person or entity with an interest in the Vehicle, that the Vehicle was towed by Universe from the scene of the accident on October 26, 2020.  (Def. 56.1 ¶ 26; Zegilla Decl. ¶ 28.)  Universe states in its Third-Party Complaint against Lloyd that it "sent notices to both beneficial owners" after it towed the Vehicle to its storage facility.  (Doc. 42 ¶ 7.)  Plaintiff's repossession of the Vehicle was conditioned on payment of a $12,030 fee, comprised of storage, towing, impound, and administration fees.  (Pl. 56.1 ¶ 17.).  Plaintiff did not agree to these conditions for release of the Vehicle.  (*Id*. ¶ 18.)[3]

---

[3] The City asserts that Universe set the conditions for release, not the City.  (Def. Response to Pl. 56.1 ¶ 18.)

As of May 11, 2019, Lloyd was in payment default of the terms of the installment contract with Plaintiff.  (Pl. 56.1 ¶ 9.)  Moreover, according to the terms of Lloyd's installment contract with Plaintiff, "by virtue of [the] seizure of the Vehicle and assertion of a *de facto* possessory lien [o]n the Vehicle" by conditioning repossession on payment,[4] Lloyd was in non-payment default as of October 26, 2020.  (*Id.*; *see also* Doc. 63-1 at 3 Retail Installment Contract § 2 (b) ("[Lloyd] agree[s] not to expose the vehicle to … seizure, … or involuntary transfer."); *id.* § 2(c) ("[Lloyd] will not allow any other security interest to be placed on the title without … written permission."); *id.* § 3(b) ("Default means … [Lloyd] break[s] any agreements in the [Retail Installment Contract]").)  Plaintiff was thus entitled to repossess the Vehicle.[5]  (Pl. 56.1 ¶¶ 9–10.)  The City does not dispute that Plaintiff was a lienholder of the Vehicle at the time of the seizure.  (Def. Response to Pl. 56.1 ¶¶ 9–10.)  Universe failed to transfer the Vehicle into the custody of the NYPD Property Clerk after the Vehicle was not claimed eight to thirty days after Universe first towed the Vehicle.  (Def. 56.1 ¶ 25; *see also* N.Y.C. Admin. Code § 20-519(b)(1).)  Thus, the NYPD Property Clerk did not process and notify all interested parties, including Plaintiff, of their opportunity to retrieve the Vehicle.  (Def. Response to Pl. 56.1 ¶ 19.)

On or about November 19, 2021—one month after filing this action—Plaintiff repossessed the Vehicle.  (Pl. 56.1 ¶ 28.)  Plaintiff did not pay any fees to Universe or the City to repossess the Vehicle "because Universe agreed to permit Santander to retrieve the Vehicle

---

[4] Although the City disputes Plaintiff's characterization of the fees as a "*de facto* possessory lien," and "Plaintiff's characterization that CNY and Universe conditioned Santander's repossession of the Vehicle on Santander's payment of a fee . . . [because it] avers that Universe acted contrary to City policy in retaining the Vehicle and imposing conditions for release of the Vehicle," (Def. Response to Pl. 56.1 ¶¶ 9, 17 (internal quotation marks omitted)), the City acknowledges that "Plaintiff was required to pay storage, towing and impoundment fees in order to repossess the Vehicle," (*id.* ¶ 17; *see also id.* ¶¶ 24–25).

[5] The City disputes that Plaintiff was "entitled to possession of the Vehicle at all relevant times" but "does not dispute that Plaintiff was a lienholder of the Vehicle at the time that the Vehicle was towed."  (Def. Response to Pl. 56.1 ¶ 10).

*pendente lite*." (*Id.*) On or about January 12, 2022, Plaintiff sold the Vehicle for $4,100. (*Id.* ¶ 29.) Plaintiff alleges that pre-judgment interest from the date of seizure to the date Plaintiff sold the Vehicle would be $218.53. (*Id.*) Moreover, Plaintiff alleges that if it had been able to repossess the Vehicle around the time that it was impounded, it would have been able to auction the Vehicle and take another assignment of a different, performing retail installment contract and, therefore, Plaintiff would have been paid at least $740.83 per month (the monthly contractual payment for the Vehicle) for the 13 months between the Vehicle's impoundment in October 2020 and its repossession in November 2021, for a total of $9,630.79. (*Id.* ¶ 30.)

## II.    **Procedural History**

Plaintiff initiated this action on October 15, 2021 by filing its Complaint, naming the City, Universe, and Anthony Acquilino ("Acquilino")—Universe's owner—as Defendants. (*See* Compl.) Count I of the Complaint asserts four violations, under 42 U.S.C. § 1983, that Defendants: (1) deprived Plaintiff of its property by unreasonable seizure in violation of the Fourth Amendment, ("§ 1983 Count I"); (2) deprived Plaintiff of its property without due process of law in violation of the Fourteenth Amendment, ("§ 1983 Count II"); (3) committed a taking of Plaintiff's property without just compensation in violation of the Fifth Amendment, ("§ 1983 Count III"); and (4) caused a substantial and unjustified impairment of contract in violation of the Contract Clause, U.S. Const. art. I § 10 cl. 1, ("§ 1983 Count IV"). (Compl. ¶¶ 86–100.) Count II asserts that Defendants' actions "also violate[d] the corresponding protection[s] of the New York State Constitution." (Compl. ¶ 102.)[6] Count III seeks a

---

[6] The parties do not purport to seek summary judgment on Plaintiff's claim that Defendants (i) caused a substantial and unjustified impairment of contract in violation of the Contract Clause, U.S. Const. art. I § 10 cl. 1 (*i.e.*, § 1983 Count IV) or (ii) violated the New York Constitution (*i.e.*, Count II, which contain separate purported violations of the New York Constitution) as none of the briefing addresses these claims. Thus, no party has demonstrated an entitlement to summary judgment on the § 1983 Count IV or Count II.

declaratory judgment under 28 U.S.C. § 2201 that Defendants' actions were unconstitutional. (Compl. ¶¶ 103–10.)  Plaintiff asserts Counts I, II, and III against the City, Universe, and Acquilino.  (*See* Compl. ¶¶ 86–110.)  Additionally, Counts IV and V of the Complaint asserts claims for conversion and violation of Section 349 of the New York General Obligations Law only against Universe and Acquilino.  (*Id*. ¶¶ 111–35.)

Universe and Acquilino answered the Complaint on November 8, 2021, (Doc. 14), and the City answered the Complaint on January 18, 2022, (Doc. 20).  On December 16, 2022, Universe filed a Third-Party Complaint against Lloyd.  (Doc. 42.)  Universe asserts that Lloyd (1) is jointly liable with Plaintiff for contribution for all damages which are alleged by Plaintiff, (2) is required to indemnify Universe if it is found to be liable to Plaintiff, and (3) was unjustly enriched by Universe's labor and storage.  (*Id*. ¶¶ 11–15.)  Universe also seeks a declaration that the Vehicle was abandoned pursuant to Section 1224 of the New York State Vehicle and Traffic Law and seeks damages for the costs of defending this action.  (*Id*. ¶¶ 10, 16.)  On January 31, 2023, Plaintiff filed a stipulation of voluntary dismissal of its claims against Universe and Acquilino.  (Doc. 44.)[7]

Following a period of discovery, on September 7, 2023, I set a briefing schedule on the parties' anticipated motions for summary judgment.  (Doc. 56.)  On November 15, 2023, Plaintiff filed its motion for summary judgment, (Doc. 59), a supporting memorandum of law, (Doc. 60 ("Pl. Mem.")), a Local Rule 56.1 statement, (Doc. 61 ("Pl. 56.1")), and two supporting declarations, (Docs. 62–63).  On December 22, 2023, the City filed a cross motion for summary

---

[7] Since the stipulation of voluntary dismissal, (Doc. 44), did not dismiss all parties in the action in its entirety, I reserve so-ordering the dismissal of Plaintiff's claims against Universe and Acquilino until after Universe submits its letter (i) advising me whether it intends to voluntarily dismiss the Third-Party Complaint pursuant to Fed. R. Civ. P. 41 or (ii) demonstrating good cause why the Third-Party Complaint should not be dismissed pursuant to Fed. R. Civ. P. 4(m) for failure to request a summons and serve Lloyd and explaining any facts that would justify the late filing of the Third-Party Complaint without first seeking leave.  *See infra* § IV.B.

judgment, (Doc. 66), a memorandum of law in support of the cross motion and in opposition to

Plaintiff's motion, (Doc. 69 ("Def. Mem.")), a Local Rule 56.1 statement, (Doc. 67 ("Def.

56.1")), a response to Plaintiff's Local Rule 56.1 statement, (Doc. 68), and a supporting

declaration, (Doc. 70).  On January 17, 2024, Plaintiff filed a reply brief in support of its cross

motion and in opposition to the City's motion, (Doc. 71 ("Pl. Reply")), and a response to the

City's Local Rule 56.1 statement, (Doc. 72).  On February 16, 2024, the City filed a reply brief

in support of its motion and in opposition to Plaintiff's motion, (Doc. 73 ("Def. Reply")).  On

March 27, 2025, I issued an order directing the parties to meet and confer and discuss the impact,

if any, of my summary judgment decision in *Mercedes-Benz Fin. Servs. USA, LLC v. City of New

York*, 770 F. Supp. 3d 643 (S.D.N.Y. 2025).  (Doc. 74.)   On May 8, 2025, after an unsuccessful

meet and confer where the parties were unable to resolve or narrow the issues, the parties filed

their letters.  (Docs. 78, 79.)  The City's position was that the *Mercedes-Benz* decision "does not

resolve the pending motions" in this case because "[t]he parties raised different legal arguments."

(Doc. 79 at 2.)  Further, the City conceded that "the Court's reasoning in dismissing Plaintiff's

Takings and Fourth Amendment seizure claims should also apply to the NYPD tow" but argued

that "the procedural due process claim is different."  (*Id*.)  The City argued that unlike the boot-

and-tow program at issue in *Mercedes-Benz* where I held

> that the risk of erroneous deprivation is high because the City has a direct pecuniary
> interest in the outcome because it retains the outstanding judgment amount, . . . that
> interest does not exist in the arterial tow context because there is no outstanding
> judgment debt.  Further, whether a vehicle is abandoned or disabled on a roadway
> is self-evident, as is the public safety interest in removing such a vehicle.  Finally,
> here, as in [*Mercedez-Benz*], the City does not concede that Plaintiffs have a
> protected property interest in retrieving a lawfully towed vehicle free from
> statutorily authorized towing fees and storage costs.

(*Id.*)  Plaintiff did not set forth its position regarding the impact of *Mercedes-Benz* in its letter, instead writing about the impropriety of the City's letter and the parties' inability to narrow issues or stipulate to a damages number.  (*See* Doc. 78.)

### III.    <u>Legal Standard</u>

To prevail on a motion for summary judgment, a movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Com. Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) (citation omitted).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:  (A) citing to particular parts of materials in the record, including depositions . . . or declarations," or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

I must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Viewing the evidence in the light most favorable to the non-moving party means that I may not "weigh the evidence" and must "eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted).  "Once the moving party has carried its burden" of citing portions of the record evincing no genuine dispute as to any material fact, "the nonmoving party 'must come forward with specific facts showing there is a genuine issue for trial,' bearing in mind that 'the mere existence of a scintilla of evidence in support of

11

the plaintiff's position will be insufficient.'" *Barr v. City of New York*, No. 16-CV-5266, 2018

WL 3407705, at *3 (S.D.N.Y. July 2, 2018) (quoting *Matsushita*, 475 U.S. at 587; *Anderson*, 477

U.S. at 252). Here, because each party has moved for summary judgment, I examine "each

party's motion . . . on its own merits," drawing all reasonable inferences "against the party whose

motion is under consideration." *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*,

628 F.3d 46, 51 (2d Cir. 2010) (internal quotation marks omitted); *see also Tang Cap. Partners,*

*LP v. BRC Inc.*, 757 F. Supp. 3d 363, 397 (S.D.N.Y. 2024).

## IV.   Discussion

I first address Plaintiff's § 1983 claims against the City, then I address the appropriate

remedies. I conclude that: (1) the City violated Plaintiff's Fourteenth Amendment due process

rights by not holding a hearing before or after impounding the Vehicle; (2) the City did not

violate Plaintiff's Fifth Amendment rights because they did not commit a taking; and (3) the City

did not violate Plaintiff's Fourth Amendment rights because the seizure and impoundment of the

Vehicle were reasonable. With regard to remedies, Plaintiff is entitled to nominal damages and a

declaratory judgment on the Fourteenth Amendment claim. I will order additional briefing

concerning compensatory damages.

### A.  Liability

#### 1.  *State Action Under § 1983*

Plaintiff asserts its various constitutional claims under 42 U.S.C. § 1983, which

"establishes a private right of action for money damages against" certain state officials or entities

that "violate a constitutional or statutory right." *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir.

2018). "In order to state a claim under § 1983, a plaintiff must allege that he was injured by

either a state actor or a private party acting under color of state law." *Ciambriello v. Cnty. of*

*Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)).

There is no dispute that the City is a state actor.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978) (concluding that § 1983 applies to municipalities).[8]  There is no dispute that the City's actions were undertaken under color of state law.  According to the Complaint, the City has a "policy and practice of summarily turning over control of seized vehicles to Universe which then imposes an *ex parte* lien for various charges."  (Compl. ¶ 1.) Moreover, the City does "not provide . . . adequate notice, nor any hearing whatsoever," after the initial seizure of a vehicle, the turnover of possession of the Vehicle to Universe, the continued seizure of the Vehicle, and the decision of Universe to assert an *ex parte* lien on the Vehicle. (Compl. ¶¶ 25, 23; *see* Zegilla Decl. ¶¶ 4–27 (describing the City's Arterial Tow Program, relevant towing rules, and the subject towing incident); Def. 56.1 ¶¶ 1–33 (same); Def. Mem. 9, 15 ("The City has standard procedures for interested parties to recover vehicles removed from the City streets under the Arterial Tow policy" but "contrary to prescribed procedures, the tow permittee never returned the Vehicle to the City for processing and to notify all interested parties.").)  While the City asserts that Universe acted contrary to its policies under N.Y.C. Admin. Code § 20-519(b)(1) when it did not transfer the Vehicle to the NYPD Property Clerk thirty days after it was towed, there is no suggestion that Universe was acting randomly and

---

[8] *Monell* provides that a municipality is liable under § 1983 when its "policy or custom" is "the moving force of the constitutional violation." 436 U.S. at 694.  The City briefly argues that it should not face *Monell* liability because "there is no underlying constitutional violation."  (Def. Mem. 22.)  The City does not dispute, however, that Universe was issued "an Arterial Tow Permit authorizing [it] to tow vehicles from certain segments of the Arterial Highways in accordance with applicable City policies and laws" and "the Vehicle was towed by Universe at the request of the NYPD."  (Def. Response to Pl. 56.1 ¶¶ 13, 12.)  Moreover, the City states that, as it relates to lienholders, its "standard procedures . . . provide for notice and an opportunity to claim a vehicle upon submitting basic documents showing entitlement to the vehicle, as well as a hold harmless letter, and paying standard minimal fees associated with towing and storing the vehicle."  (Def. Mem. 9.)  Since the City essentially concedes that "policy or custom" element, it will be liable under *Monell* for any constitutional violations from this Arterial Tow "policy."  436 U.S. at 694.

without authority when it seized and impounded the Vehicle without a hearing.  (Def. 56.1 ¶¶ 22–23 ("NYPD [] contacted Universe . . . to tow the Vehicle" and "[a]n NYPD officer present at the scene of the accident authorized Universe to tow the Vehicle to its storage facility.").)  The City also fails to explain why it took no action after the Vehicle remained unclaimed at Universe's storage facility for more than thirty days when N.Y.C. Admin. Code § 20-519(b)(1) requires that "the permittee must transfer the Vehicle to the NYPD Property Clerk within eight (8) to thirty (30) days after towing the vehicle to its storage facility."  (Def. 56.1 ¶ 12.)  Although the City asserts that its "prescribed procedures were not followed in this case," (Def. Mem. at 2), an NYPD officer "authorized Universe to tow the vehicle" on October 26, 2020, (Def. 56.1 ¶¶ 20, 23), and the City seemingly failed to monitor the amount of days that Universe possessed the Vehicle.  The City's actions are therefore state actions, and Plaintiff may challenge them under § 1983.  Thus, the only remaining question before me as to Count I is whether the City's actions deprived Plaintiff of its constitutional rights.

### 2.  Fourteenth Amendment Due Process

Next, I consider Plaintiff's due process claim, on which the parties have moved for summary judgment.  "The Due Process Clause of the Fourteenth Amendment provides that no state shall 'deprive any person of life, liberty or property, without due process of law.'" *Santander Consumer USA, Inc. v. City of Yonkers*, No. 22-CV-8870, 2024 WL 4817649, at *9 (S.D.N.Y. Nov. 18, 2024) (quoting U.S. Const. amend. XIV § 1).  In evaluating a due process claim, a court must consider (1) whether the defendant deprived the plaintiff of "a liberty or property interest protected by the Due Process [C]lause; and, if so, [(2)] whether existing state procedures are constitutionally adequate."  *Ford Motor Credit Co. v. NYC Police Dep't*, 503 F.3d 186, 190 (2d Cir. 2007) (quoting *Kapps v. Wing*, 404 F.3d 105, 112 (2d Cir. 2005)).

a.  <u>Plaintiff's Property Interest</u>

Plaintiff, as a secured creditor, had "two rights:  the *contractual* right to repayment of the

debt owed and the *property* right to the collateral that secures the debt in the event of non-

payment." *Ford*, 503 F.3d at 191 (quoting *Armstrong v. United States*, 364 U.S. 40, 46 (1980))

(emphasis in original).  The Second Circuit has held that under these circumstances the Due

Process Clause protects an auto-financing company's "property interest in the present value of a

seized vehicle."  *Id.*  Even "a temporary, nonfinal deprivation of property is nonetheless a

'deprivation' in the terms of the Fourteenth Amendment."  *Fuentes v. Shevin*, 407 U.S. 67, 85

(1972).  "Indeed, the several-month delay in recovering Plaintiff's vehicle is a deprivation."

*HVT, Inc. v. Port Auth. of New York & New Jersey*, No. 15-CV-5867, 2018 WL 3134414, at *7

(E.D.N.Y. Feb. 15, 2018), *report and recommendation adopted*, 2018 WL 1409821 (E.D.N.Y.

Mar. 21, 2018) (citing *Ford*, 503 F.3d at 192).  "Defendants deprived Plaintiff of its property

right to the value of the Vehicle upon its seizure, because thereafter Plaintiff could not repossess

it without submitting to Defendants' conditions, including the payment of various towing and

storage fees."  *Mercedes-Benz*, 770 F. Supp. 3d at 656.  *Cf. Santander Consumer USA, Inc. v.

Cnty. of Nassau*, 623 F. Supp. 3d 6, 16–17 (E.D.N.Y. 2022) (explaining that seizure and

subsequent retention of vehicle subject to a lien abridged the lienholder's property interests);

*Santander Consumer USA, Inc. v. Cnty. of Suffolk*, No. 20-CV-2656, 2021 WL 4480574, at *6

(E.D.N.Y. Sept. 30, 2021) (same).  Courts have described the condition that a secured creditor

pay for "towing and storage fees" to retrieve a seized vehicle as a "lien" that "encumber[s]" the

creditor's interest in the vehicle.  *Cnty. of Nassau*, 623 F. Supp. 3d at 18.  Although the City

disputes Plaintiff's characterization of the fees as a "*de facto* possessory lien," (Def. Response to

Pl. 56.1 ¶ 9), the City acknowledges that "Plaintiff was required to pay storage, towing and

impoundment fees in order to repossess the Vehicle," (*id.* ¶ 17; *see also id.* ¶¶ 24–25), and admits that "the tow permittee . . . retained the vehicle for months, issued a notice of lien to Plaintiff and other parties, and demanded that Plaintiff pay thousands in fees," (Def. Mem. 23). Regardless of whether the conditions on the release of the Vehicle are called a "lien" or something else, there is no question that the conditions deprived Plaintiff of its property interest in the Vehicle. There is also no question that Plaintiff's actions did not result in the towing and storage fees. I note as well that the value of the Vehicle at the time of the seizure was greater than its value at the time of the auction, because a "vehicle depreciates over time." *City of Yonkers*, 2024 WL 4817649, at *8 (quoting *TD Auto Fin. LLC v. Cnty. of Putnam*, No. 21-CV-9080, 2023 WL 6295116, at *7 (S.D.N.Y. Sept. 27, 2023)); *cf. Ford*, 503 F.3d at 191 (noting that "the government must compensate mortgage holders for the depreciation in their security interest between the date the collateral became forfeitable and the date the government obtained a final judgment of forfeiture" (citation omitted)).

The City argues that Plaintiff "does not have a 'present possessory right' to a seized vehicle," and that its interest is only in "proceeds from the [] forfeiture sale" plus "any deficiency," which can be recouped from "the debtor." (Def. Mem. 9 (quoting *Prop. Clerk v. Molomo*, 613 N.E.2d 567, 567 (1993)).) The Second Circuit rejected this precise argument in *Ford*, "disagree[ing]" with the City's argument "that [the lienholder's] only cognizable property interest is in a vehicle's sale proceeds." 503 F.3d at 190–91.[9] By focusing on the "present possessory right," and in noting that "a lienholder's interest is 'not as great as the interest of the vehicle's owner in possession of a seized vehicle,'" (Def. Mem. 9 (quoting *Ford*, 503 F.3d at

---

[9] Indeed, the City cited *Molomo* in *Ford* to support the very proposition it advocates here, and, as discussed, the Second Circuit explicitly rejected the City's argument. *See* 503 F.3d at 190–91.

194)), the City misses the point of the *Ford* case, which is that the Due Process Clause protects a lienholder's "property interest" in a seized vehicle, 503 F.3d at 191. "The degree of protection that the Constitution requires of that right is a separate question." *Mercedes-Benz*, 770 F. Supp. 3d at 657. *See infra* § IV.A.2.b.

For these reasons, I find that Plaintiff has a property interest in the Vehicle protected by the Due Process Clause.

###### b. The Process Plaintiff Was Due

Having concluded that Defendants deprived Plaintiff of a property interest, the next question is the process that Plaintiff was due. *See Ford*, 503 F.3d at 192. The "general" requirement is that "'individuals must receive notice and an opportunity to be heard before the Government deprives them of property.'" *TD Auto*, 2023 WL 6295116, at *7 (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993)). Due process, however, is a "flexible" concept, and the Constitution "does not, in all cases, require a hearing before the state interferes with a protected interest, so long as some form of hearing is provided before an individual is finally deprived of the property interest." *Cnty. of Nassau*, 623 F. Supp. 3d at 17 (quoting *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011)) (cleaned up). To account for this, courts apply a three-factor balancing test drawn from the Supreme Court's decision in *Mathews v. Eldridge*, which:

> requires consideration of . . . [(1)] the private interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976); *see Nnebe*, 644 F.3d at 158 ("*Mathews* is the test for both when a hearing is required (*i.e.*, pre- or post-deprivation) and what kind of procedure is due." (quoting *Brody v. Vill. of Port Chester*, 434 F.3d 121, 135 (2d Cir. 2005))).

The City provides the following process:  An Arterial Tow "permittee shall not remove any vehicle without first completing a standard Authorization to Tow form" which can be "signed by the Police Officer or Traffic Enforcement Agent who directs the removal of the vehicle" if the "'person in charge' of the vehicle is not present."  (Def. 56.1 ¶¶ 6–7).  "After the vehicle has been towed, the NYPD sends a Rotation-Tow Owner Notification to the registered owner of the vehicle which informs the owner that the vehicle has been towed and procedures for obtaining the vehicle."  (*Id*. ¶ 10.)  "If the vehicle remains unclaimed at a permittee's storage facility, the permittee must transfer the vehicle to the NYPD Property Clerk within eight (8) to thirty (30) days after towing the vehicle to its storage facility."  (*Id*. ¶ 12.)  "Typically, within one week of a vehicle being transferred to the NYPD, the Property Clerk provides notice to all parties with an interest in the vehicle, including lienholders, that the vehicle is currently being held by the NYPD Property Clerk."  (*Id*. ¶ 13.)  "The notice provides that a claimant has 'fifteen (15) days from the date of this notice to claim your vehicle.  If you fail to claim your vehicle in fifteen (15) days, it will be deemed abandoned' and 'sold at auction or otherwise disposed…'"  (*Id*. ¶ 14 (quoting Doc. 70-4 at 72.).)  The City asserts that the "NYPD Property Clerk's notification procedures related to other interested parties, such as lienholders, were never implicated" because Universe did not transfer the Vehicle to the NYPD Property Clerk at any time after removing the Vehicle from the FDR Drive on October 26, 2020.  (Def. Mem. 5; Def. 56.1 ¶ 25.)  It is undisputed that the City "denies that it is legally obligated to have a regular policy or custom" of holding a hearing relating to the seizure of a vehicle pursuant to the Arterial

Tow Program. (Def. Response to Pl. 56.1 ¶ 21.) It is also undisputed that the City "did not arrange for a hearing before a neutral decisionmaker relating to the propriety of the towing of the Vehicle, its turnover of possession to Universe, Universe's continued possession of the Vehicle, or Universe's request for payment in exchange for possession of the Vehicle." (*Id*.)

Plaintiff argues that by failing to provide lienholders with the opportunity for any hearing at any time, the Arterial Tow Program is per se unconstitutional such that there is no need to apply the *Mathews* balancing test. (Pl. Mem. 11–12.) I agree. "The law is clear that some form of hearing is required—either pre- or post-seizure—before an individual or entity is finally deprived of a property interest, and that the absence of any hearing whatsoever necessarily will fail the *Mathews* balancing test." *TD Auto*, 2023 WL 6295116, at *9 (citing *Mathews*, 424 U.S. at 333; *Propert v. Dist. of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991); *HVT, Inc.*, 2018 WL 3134414, at *9). "Because the [Arterial Tow] program does not provide Plaintiff the opportunity to challenge the conditions of the Vehicle's release with 'some form of hearing,' the program violates Plaintiff's rights under the Due Process Clause." *Mercedes-Benz*, 770 F. Supp. 3d at 658 (quoting *Mathews*, 424 U.S. at 333). Decisions considering a similar City program known as the "Scofflaw program"—a City program enforcing unpaid parking and traffic tickets whereby the City seizes a vehicle if the registered owner accrues more than $350 in judgments and that does not provide an opportunity for a hearing as part of the vehicle seizure and impoundment—within the Second Circuit have reached the same conclusion. *See id*. (collecting cases).

The City asserts that its failure to hold a hearing is not a per se denial of due process because the City is not conceding that its policy amounts to a "no hearing policy." (Def. Mem. 8.) Although the City does not concede that its policy fails to provide for any hearing procedure, either before or after towing, the City "denies that it is legally obligated to have a regular policy

or custom of doing so," (Pl. 56.1 ¶ 21), and has failed to point to any policy affording an opportunity for a hearing, which is "fatal to the constitutional validity of [the City's] policy." *HVT, Inc.*, 2018 WL 3134414, at *11.  The City asserts that it has a "informal" "process . . . undertaken by NYPD employees" where "designated employees [] review parties' rights to a vehicle and, where appropriate, issue a release."  (Def. Mem. 11.)  The City also points out that the Supreme Court has "stat[ed] that a 'due process hearing' can be satisfied by an 'opportunity for informal consultation with designated personnel.'"  (Def. Mem. 8 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16 n.17 (1978).)  "Although the City accurately quotes the Supreme Court," the City fails to "identify any opportunity Plaintiff had to challenge the seizure of the Vehicle or the imposition of conditions on its return."  *Mercedez-Benz*, 770 F. Supp. 3d at 658.  "In other words, [the City] do[es] not even provide an 'opportunity for an informal consultation,' so this citation only proves Plaintiff's point."  *Id.* (quoting *Craft*, 436 U.S. at 16 n.17).

Although there is no need to apply the *Mathews* factors under the circumstances presented here, doing so confirms that the Arterial Tow Program violates Plaintiff's due process rights.  As to the first factor, Plaintiff's "private interest . . . in the present value of the Vehicle is 'considerable.'"  *City of Yonkers*, 2024 WL 4817649, at *11 (quoting *Ford*, 503 F.3d at 194); *accord TD Auto*, 2023 WL 6295116, at *11.  This factor favors Plaintiff, even though I recognize that, because Plaintiff does not use the vehicle "'as a mode of transportation or the means to earn a livelihood,'" its interest in the vehicle is "not as great as the interest of the vehicle's owner in possession."  *Ford*, 503 F.3d at 194 (quoting *Krimstock v. Kelly*, 306 F.3d 40, 61 (2d Cir. 2002), *abrogated on other grounds by Culley v. Marshall*, 601 U.S. 377, 386 (2024)).

The second *Mathews* factor considers "risk of an erroneous deprivation" of Plaintiff's interest "through the procedures" in place, "and the probable value, if any, of additional or substitute procedural safeguards" to that interest.  424 U.S. at 335.  Plaintiff's concern is that the "*ex parte* appropriations of property create an unacceptable risk of error . . . where the lienholder is not permitted to participate in the government action that impacts its property."  (Pl. Mem. 12–13.)  This risk of erroneous deprivation is "high," because without a hearing, Plaintiff has "no opportunity to present any argument before a neutral arbitrator about whether [Defendants are] actually entitled to possess the Vehicle, assess" towing and storage "fee[s], or dispose of the Vehicle" in a public auction.  *TD Auto*, 2023 WL 6295116, at *11; *accord City of Yonkers*, 2024 WL 4817649, at *11.  The value of a hearing "is of particular importance here, where the Government has a direct pecuniary interest in the outcome of the proceeding" since it retains the auction sale proceeds.  *James Daniel Good*, 510 U.S. at 55–56.  This factor also weighs in Plaintiff's favor.

The third *Mathews* factor considers the City's interest in its current Arterial Tow procedures and the "burden" it would face "if it were required to provide additional procedural safeguards."  *TD Auto*, 2023 WL 6295116, at *11 (citation omitted).  "The relevant question concerns the burden that Defendants would face if it had to provide Plaintiff's requested additional safeguard," *Mercedes-Benz*, 770 F. Supp. at 660, which is only "one hearing before a neutral" decisionmaker, (Pl. Mem. 14).  *Cf. TD Auto*, 2023 WL 6295116, at *11 (explaining that the defendant's "legitimate interests in civil forfeiture and public safety writ large . . . do not justify," *inter alia*, "fully deny[ing] lienholders any opportunity to be heard with respect to the propriety of the seizure").

The City claims, without citation to evidence, that it has a "high" "interest in having an NYPD employee make informal release decisions in accordance with standard policies." (Def. Mem. 13.) "This unsupported statement cannot sustain Defendants' (or withstand Plaintiff's) summary judgment motions." *Mercedes-Benz*, 770 F. Supp. 3d at 660 (finding that New York City's "claim[], without citation to evidence, that it has a 'high' interest in 'in having a City employee make release determinations'" was insufficient to sustain plaintiff's summary judgment motion). "Indeed, the City does not explain why it has a high interest in having a[n NYPD] employee make release determinations." *Id.* The City also argues that "the Arterial Tow policy provides lienholders prompt notice and an opportunity to be heard and ultimately recover vehicles" and "requiring more . . . would create a financial and administrative burden out of proportion to the interests at stake and the risk of an erroneous deprivation." (Def. Mem. 14 (citing *Manza v. Newhard*, 915 F. Supp. 2d 638, 648 (S.D.N.Y. 2013) (alterations adopted)); *see also id.* ("forcing the City and a tow operator to absorb towing and storage costs anytime a lienholder recovers a vehicle would be burdensome").). "As an initial matter, neither the City nor the vendor is being forced to absorb the towing and storage cost— it takes those costs out of the auction proceeds" for an unclaimed vehicle and any remaining sale proceeds are deposited into the City's general fund. *Mercedes-Benz*, 770 F. Supp. 3d at 660; *see* Zegilla Decl. ¶ 20. In any event, the City misunderstands "the Fourteenth Amendment guarantee that deprivations of property be accomplished only with due process of law." *Krimstock*, 306 F.3d at 67. Plaintiff does not, in connection with its due process claim, seek a determination that it need not pay Defendants' towing and storage fees. It seeks only to require Defendants to provide an opportunity to challenge the seizure and resulting fees. (*See* Pl. Mem. 1–3.) In other words, I am not being asked to make a determination concerning the propriety of the towing and storage

fees.  Defendants have no answer to whether and how holding a hearing—which, as Plaintiff points out, may be accomplished through the City's existing Office of Administrative Trials and Hearings, (Pl. Mem. 3, 14 n.4)—would impose a burden.

"Balancing the foregoing interests on the undisputed facts confirms as a matter of law that Defendants violated the Fourteenth Amendment's guarantee of due process by failing to provide an opportunity for Plaintiff to seek review of the Vehicle's seizure and detention." *Mercedes-Benz*, 770 F. Supp. 3d at 660; *see, e.g., Cnty. of Nassau*, 623 F. Supp. 3d at 21 (concluding that plaintiff's due process rights were violated); *Toyota*, 2023 WL 4443992, at *10 (holding that plaintiff "has established a constitutional deprivation by failing to provide timely notice and a hearing before a neutral decisionmaker to review the warrantless seizure"); *TD Auto*, 2023 WL 6295116, at *11 (holding that plaintiff "did not have any formal opportunity to be heard regarding its interest in the Vehicle"); *City of Yonkers*, 2024 WL 4817649, at *11 (same). Where, as here, "the existing [process] is found deficient[,] the district court then has considerable latitude to frame a decree with input from the parties and within the guidelines set by the court of appeals." *Nnebe*, 644 F.3d at 160.  Thus, I order the parties to meet and confer concerning the structure of a review process and then to jointly submit a hearing proposal consistent with this Opinion & Order and applicable law.  *See Mercedes-Benz*, 770 F. Supp. 3d at 660 (ordering same briefing); *HVT, Inc.*, 2018 WL 3134414, at *11 (recommending similar briefing); *see infra* § V.

Plaintiff's motion for summary judgment on its Fourteenth Amendment claim is GRANTED, and the City's summary judgment motion on this claim is DENIED.

### 3. *Fifth Amendment Taking*

The parties also seek summary judgment on Plaintiff's Fifth Amendment claim. "The Fifth Amendment provides that 'private property [shall not] be taken for public use, without just compensation.'" *City of Yonkers*, 2024 WL 4817649, at *11 (quoting U.S. Const. amend. V (alteration in original)). This provision "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong*, 364 U.S. at 49. Thus, "[a] property owner" may bring what is called a "Fifth Amendment takings claim" under § 1983 "when the government takes his property without paying for it." *Knick v. Twp. of Scott*, 588 U.S. 180, 185 (2017). "Plaintiff's security interest in the Vehicle was a property interest to which the Fifth Amendment applies." *Mercedes-Benz*, 770 F. Supp. 3d at 661; *see also City of Yonkers*, 2024 WL 4817649, at *12; *Ford*, 503 F.3d at 191 (explaining that "a valid Takings Clause claim lay where plaintiff's liens remain in effect but were unenforceable against the collateral following forfeiture" (citing *Armstrong*, 364 U.S. at 46)). Plaintiff's theory of liability is that Defendants effected a taking on its right to repossess the Vehicle by impounding it between October 26, 2020 and November 19, 2021, when Plaintiff recovered the Vehicle. (*See* Pl. Reply 13–15.)

Thus, "[t]he next inquiry is whether there was a taking" within the meaning of the Fifth Amendment. *City of Yonkers*, 2024 WL 4817649, at *12. The law recognizes two types of takings: (1) "physical takings," which occur "[w]hen the government physically takes possession of an interest in property for some public purpose," and (2) "regulatory takings," which involve "regulations that prohibit a property owner from making certain uses of her private property." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302,

321–22 (2002); *see also 74 Pinehurst LLC v. New York*, 59 F.4th 557, 563–64 (2d Cir. 2023)

(applying the law relevant to physical and regulatory takings).

Different rules apply to physical and regulatory takings. *See Tahoe-Sierra*, 535 U.S. at

321–24. A physical taking always creates "a categorical duty" for the government "to

compensate the former owner, regardless of whether the interest that is taken constitutes an entire

parcel or merely a part thereof," and even if the government's use is "temporary." *Id*. at 322

(internal citations omitted). By contrast, evaluating a regulatory taking requires "essentially ad

hoc, factual inquiries," *id*. (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104,

124 (1978)), into whether "a regulation goes 'too far' in restricting a landowner's ability to use

his own property," *74 Pinehurst*, 59 F.4th at 564 (quoting *Pennsylvania Coal Co. v. Mahon*, 260

U.S. 393, 415 (1922)).

"Plaintiff's claimed taking—the Vehicle's impoundment—is not easily categorizable as a

regulatory or physical taking." *Mercedes-Benz*, 770 F. Supp. 3d at 661; *cf. Cedar Point Nursery

v. Hassid*, 594 U.S. 139, 147–48 (2021) (concluding that a regulation caused a physical taking);

*id*. at 166 (Breyer, J., dissenting) (observing that the regulation at issue "only awkwardly fit[] the

terms 'physical taking' and 'physical appropriation'"). Defendants "physically [took] possession

of" the Vehicle "without acquiring title to it," a situation the Supreme Court has classified as a

physical taking. *Cedar Point Nursery*, 594 U.S. at 147–48 (citing *United States v. Pewee Coal

Co.*, 341 U.S. 114, 115–117 (1951)). Moreover, in *Ford*, the Second Circuit concluded that the

plaintiff automobile finance company had a property right "in the collateral itself—the seized

vehicle." *Ford*, 503 F.3d at 191. Plaintiff asserts that the City "used possession of the Vehicle to

compensate Universe in lieu of providing Universe monetary consideration" for its towing and

storage services and that the City's "use of Santander's collateral—and subordination of

Santander's lien rights to Universe's *de facto* possessory lien and [the City's] demand for payment—resulted in an uncompensated taking of Santander's rights." (Pl. Mem. 18, 20.)

I find that Plaintiff's Fifth Amendment claim fails regardless of whether Defendants' conduct was a physical or regulatory taking. I begin with analyzing Defendants' conduct as a regulatory taking. Evaluating purported temporary regulatory takings such as the Vehicle's impoundment "requires careful examination and weighing of all the relevant circumstances," *Tahoe-Sierra*, 535 U.S. at 335 (internal quotation marks omitted), which include the "economic impact" of the purported taking, "the extent to which the regulation has interfered with distinct investment-backed expectations," and "the character of the governmental action," *74 Pinehurst*, 59 F.4th at 566 (quoting *Penn Central*, 438 U.S. at 124).

The economic impact of the impoundment here weighs against Plaintiff. The duration of the impoundment was, in Plaintiff's words, a "temporary delay in regaining possession." (Pl. Mem. 9.) Plaintiff first learned of the Vehicle's impoundment in June 2021, "nearly 8 months after the seizure" when "Santander received a notification from Universe that Universe was claiming a lien for towing and storage fees." (*Id*. at 4.) Santander recovered the Vehicle in November 2021, five months after receiving notice of its impoundment and thirteen months after the Vehicle was impounded. (*Id*. at 5.) Because "[t]he monthly contractual payment to Santander for the [V]ehicle was $740.83, . . . the approximate loss of use damages to Santander is $740.83 for 13 months, or $9,630.79." (*Id*. at 23.) Moreover, Santander ultimately sold the Vehicle for $4,100 in January 2022, (Pl. 56.1 ¶ 29), and asserts that it "would *at least* have obtained the same $4,100 earlier had it been permitted to retrieve its collateral." (Pl. Mem. 23 (emphasis in original).) Finally, Plaintiff asserts that the "vehicle was damaged" and "depreciate[ed]." (*Id*.) However, Plaintiff does not and cannot claim that, as in *City of Yonkers*,

that Defendants "destroy[ed]" its entire "property interest in the vehicle."  2024 WL 4817649, at *12 (citing *Armstrong*, 364 U.S. at 48).  In that case, the defendant municipality "obtained title to the Vehicle and subsequently sold it," presumably keeping the proceeds for itself.  *Id.*; *see also Armstrong*, 364 U.S. at 48 (explaining that "the Government for its own advantage destroyed the value of the [plaintiff's] liens, something that the Government could do because its property was not subject to suit, but which no private purchaser could have done"); *Mercedes-Benz*, 770 F. Supp. 3d at 662 (finding that the economic impact of the impoundment weighed against the plaintiff where the vehicle "was auctioned subject to [Plaintiff]'s recorded lien, and that all remaining auction proceeds less the outstanding judgments and fees, were relinquished to the owner of [the Vehicle]" (internal citations omitted).).  Here, by contrast, Plaintiff admits that the Vehicle was damaged in the accident, Plaintiff repossessed it without paying any fees to Universe or the City, (Pl. 56.1 ¶ 28), and was able to sell the Vehicle as a damaged vehicle, (*id.* ¶ 29; Pl. Mem. 23).

Plaintiff's expectation interest in the Vehicle and the Arterial Tow Program also weighs against concluding the impoundment was a regulatory taking.  *See 74 Pinehurst*, 59 F.4th at 566. Indeed, Plaintiff's installment contract with Lloyd contemplated the possibility of the a "seizure" or "involuntary transfer" of the Vehicle; it is that language in the installment contract, in addition to Lloyd's payment default, that entitled Plaintiff to repossess the Vehicle in the first instance. (Pl. 56.1 ¶ 9.)  Thus, Plaintiff cannot claim that it entered into the installment contract "in reliance on a state of affairs that did not include" the potential that the Vehicle might be seized and temporarily detained.  *74 Pinehurst*, 59 F.4th at 567 (citation omitted); *see also Mercedes-Benz*, 770 F. Supp. 3d at 662–63 (finding that Plaintiff's expectation interest in a vehicle and New York City's boot-and-tow program weighs against concluding that the vehicle's impounding

was a regulatory taking where the plaintiff's installment contract with the registered owner "contemplated the possibility of the government's seizure of the Vehicle").

Finally, "the character of the governmental action" does not favor Plaintiff. *74 Pinehurst*, 59 F.4th at 566 (quoting *Penn Central*, 438 U.S. at 124). It is true that Government action which "can be characterized as a physical invasion," as here, often points towards a taking. *Id.* at 568 (quoting *Penn Central*, 438 U.S. at 124). However, the Vehicle is not Plaintiff's personal property, and Plaintiff's right to possess it derives from Lloyd's default on the installment contract. (*See* Pl. 56.1 ¶¶ 9–10; Pl. Mem. 3 ("Lloyd . . . had defaulted on the monetary terms of the retail installment contract relating to the Vehicle, entitling Santander to immediate possession.").) Moreover, the Arterial Tow Program "serve[s] 'important public interests'" of traffic enforcement. *74 Pinehurst*, 59 F.4th at 568 (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987)). As the City states, "leaving an abandoned car on a highly trafficked parkway in the middle of Manhattan poses serious safety risks to drivers and pedestrians alike." (Def. Mem. 18.) The balance of the regulatory taking factors weighs against Plaintiff.

Considering Plaintiff's claim as one for a physical taking[10] leads me to reject it for a different reason. The Supreme Court observed that "traditional common law privileges to access private property" are "background limitations" to physical-takings claims. *Cedar Point*, 594 U.S. at 160. In other words, traditionally sanctioned Government intrusions into private property interests are not physical takings. *See id.* at 160–61. "For example, the government owes a

---

[10] Here, Plaintiff's claim is that Defendants effectuated a taking during the duration of the Vehicle's impoundment. This is similar to the government's "temporary occupancy of a portion of a leased building," which the Supreme Court has explained is a physical taking entitling the owner to any "consequential damage[s]" that might be proven, including opportunity costs and depreciation. *United States v. Gen. Motors Corp.*, 323 U.S. 373, 375, 381–84 (1945).

landowner no compensation for requiring him to abate a nuisance on his property, because he never had a right to engage in the nuisance in the first place." *Id*. at 160 (citation omitted).  Here, Defendants' seizure of the Vehicle was consistent with New York law, *see* N.Y.C. Admin. Code § 20-519(b)(1), and as I discuss *infra* § IV.A.4, consistent with the Fourth Amendment.  Thus, it did not invade a traditional property right such that it caused a physical taking.  *Cf. Cedar Point*, 594 U.S. at 161 ("Because a property owner traditionally had no right to exclude an official engaged in a reasonable search, government searches that are consistent with the Fourth Amendment and state law cannot be said to take any property right from landowners." (internal citation omitted)).

In sum, I conclude that Defendants did not, as a matter of law, commit a Fifth Amendment taking.  Thus, Plaintiff's summary judgment motion on this claim is DENIED, and City's summary judgment motion on this claim is GRANTED.

### 4.  *Fourth Amendment Unreasonable Seizure*

Next, I address whether any party is entitled to summary judgment on Plaintiff's Fourth Amendment claim.  "The Fourth Amendment protects individuals against 'unreasonable searches and seizures.'"  *City of Yonkers*, 2024 WL 4817649, at *6 (quoting U.S. Const. amend. IV).  By towing and impounding the Vehicle, Defendants "seized" it within the meaning of the Fourth Amendment because there was "'some meaningful interference with an individual's possessory interest in that property.'"  *See Harrell v. City of New York*, 138 F. Supp. 3d 479, 488 (S.D.N.Y. 2015) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)); *see also Vasquez v. Yadali*, No. 16-CV-895, 2020 WL 1082786, at *7 (S.D.N.Y. Mar. 5, 2020) ("The impoundment of a vehicle may implicate rights guaranteed by the Fourth Amendment's protection against unreasonable searches and seizures." (quoting *Bey v. Dist. of Columbia*, No. 17-CV-620, 2018

WL 5777021, at *5 (E.D.N.Y. Nov. 1, 2018)).  "It is unclear, however, whether the Fourth

Amendment protected Plaintiff's interest, as opposed to [Lloyd's] interest, in the Vehicle at the

time that it was seized.  As discussed, [Lloyd] defaulted on her contract with Plaintiff at the time

of the seizure; thereafter, the contract entitled Plaintiff to repossess the Vehicle."  *Mercedes-Benz*,

770 F. Supp. 3d at 664.  "Courts have concluded that the Fourth Amendment does not necessarily

protect a lienholder's rights at the time of a seizure even when, as here, the seizure is a default

under an installment contract entitling the lienholder to repossession."  *Id.*; *see Cnty. of Nassau*,

623 F. Supp. 3d at 15–16; *Cnty. of Suffolk*, 2021 WL 4480574, at *6.

 Even assuming Plaintiff had Fourth Amendment interests in the Vehicle, the seizure did

not violate them.  The "ultimate" question of whether the Fourth Amendment permits a seizure is

whether the seizure was reasonable; this inquiry involves "careful balancing of governmental and

private interests" at stake.  *Harrell*, 138 F. Supp. 3d at 488 (quoting *Soldal v. Cook Cnty.*, 506

U.S. 56, 71 (1992)).

 I, along with other courts, have previously found that the "towing and impoundment of

vehicles" based on a valid parking and traffic ticket judgments and authorized under a different

City program, the Scofflaw program, is "reasonable under the Fourth Amendment."  *Mercedes-

Benz*, 770 F. Supp. 3d at 664 (collecting cases).  Similarly, I find that the towing and

impoundment of vehicles because they are abandoned and authorized under N.Y.C. Admin.

Code § 20-519(b)(1) is also reasonable under the Fourth Amendment.  This finding is also

supported by the fact that seizures to remove abandoned vehicles in order to ensure public safety

and ease congestion, like seizures solely to enforce civil judgments, "do[] not implicate core

privacy concerns requiring a warrant," *Tsinberg v. City of New York*, 2021 WL 1146942, at *10

(S.D.N.Y. Mar. 25, 2021) (quoting *Shibeshi v. City of New York*, 2011 WL 13176091, at *2

(S.D.N.Y. Sept. 21, 2011)), especially since the Vehicle is not Plaintiff's "personal property,"

*Harrell*, 138 F. Supp. 3d at 488 (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)) (cleaned

up). It is undisputed that the Vehicle was seized because it was abandoned after it was involved

in an accident. (Pl. 56.1 ¶ 12.) "[I]n the interests of public safety and as part of what the

Supreme Court has called community caretaking functions, automobiles are frequently taken into

police custody.'" *Santander Consumer USA, Inc. v. Port Auth. of New York and New Jersey*, No.

20-CV-1997, 2022 WL 3099239, at *5 (E.D.N.Y. Aug. 4, 2022) (quoting *South Dakota v.*

*Opperman*, 428 U.S. 364, 368–69 (1976)) (alteration adopted) (internal quotation marks

omitted); *see also United States v. Morris*, No. 20-CR-100, 2022 WL 1651408, at *4 (W.D.N.Y.

Apr. 12, 2022) ("It is well established that police have the authority, despite the absence of a

warrant, to seize and remove from the streets automobiles in the interests of public safety and as

part of their community caretaking functions—an authority that is beyond reasonable challenge."

(quoting *United States v. Lyle*, 919 F.3d 716, 728 (2d Cir. 2019))), *report and recommendation*

*adopted*, 2022 WL 1645261 (W.D.N.Y. May 24, 2022)).

Plaintiff concedes that there are instances when the City "validly seizes property under its

Arterial Tow Program" but takes issue with the continued possession of the Vehicle "[e]ven

assuming [the City's] initial warrantless seizure was valid." (Pl. Mem. 17, 16.) However,

"[b]ecause the initial seizure was reasonable, there is no separate Fourth Amendment claim for

its continued retention." *Mercedes-Benz*, 770 F. Supp. 3d at 664; *see also Bennett v. Dutchess*

*Cnty.*, 832 F. App'x 58, 60 (2d Cir. 2020) (summary order) ("'[A] seizure claim based solely on

the unlawful retention' of property that was lawfully seized has been recognized as 'too novel a

theory to warrant Fourth Amendment protection.'" (quoting *Shaul v. Cherry Valley-Springfield*

*Cent. Sch. Dist.*, 363 F.3d 177, 187 (2d Cir. 2004))); *see also Vasquez v. Warren*, 630 F. Supp. 3d

524, 543 (S.D.N.Y. 2022) ("To the extent the Constitution affords any right with respect to a government agency's retention of lawfully seized property, it would appear to be procedural due process." (quoting *Ahlers v. Rabinowitz*, 684 F.3d 53, 62 (2d Cir. 2012))); *City of Yonkers*, 2024 WL 4817649, at *7.

Plaintiff's Fourth Amendment claim fails.  Therefore, Plaintiff's summary judgment motion on this claim is DENIED, and City's summary judgment motion on this claim is GRANTED.

### B.  *Universe's Third-Party Claims Against Justina Lloyd*

On December 16, 2022, Universe filed a Third-Party Complaint against Lloyd.  (Doc. 42.)  Universe asserts that Lloyd (1) is jointly liable with Plaintiff for contribution for all damages which are alleged by Plaintiff, (2) is required to indemnify Universe if it is found to be liable to Plaintiff, and (3) was unjustly enriched by Universe's labor and storage.  (*Id*. ¶¶ 11–15.) Universe also seeks a declaration that the Vehicle was abandoned pursuant to Section 1224 of the New York State Vehicle and Traffic Law and seeks damages for the costs of defending this action.  (*Id*. ¶¶ 10, 16.)  On January 31, 2023, Plaintiff filed a stipulation of voluntary dismissal of its claims against Universe and Acquilino.  (Doc. 44.)  The stipulation of voluntary dismissal does not resolve Universe's claims against Lloyd because it does not stipulate to the dismissal of the Third-Party Complaint against Lloyd.  (*See* Doc. 44.)

First, it does not appear that Universe ever served Lloyd with the Third-Party Complaint pursuant to Fed. R. Civ. P. 4(m).  A summons was never requested or issued as to Lloyd and Universe did not otherwise file an affidavit of service as to Lloyd, despite the Third-Party Complaint being filed nearly three years ago on December 16, 2022, (Doc. 42).  Second, the Third-Party Complaint is untimely because Rule 14(a) mandates that "the third-party plaintiff

must, by motion, obtain the court's leave if it files the third-party complaint more than 14 days after serving its original answer." Fed. R. Civ. P. 14(a).  Universe filed its answer on November 8, 2021, (Doc. 14), notified me that it was intending to file a third-party complaint on November 23, 2022, (Doc. 37), and filed the Third-Party Complaint on December 16, 2022, (Doc. 42)— more than thirteen months after filing its answer.  Universe did not request, nor obtain, my leave prior to filing the Third-Party Complaint and did not request, nor obtain, my leave to extend the time to effectuate service upon Lloyd.  Moreover, Universe proffered no excuse for the considerable delay in bringing third-party claims against Lloyd, despite being aware of the facts underlying its claims since it was served with the Complaint on October 25, 2021.  (Doc. 13.) The Third-Party Complaint was thus improperly brought under Rule 14(a) because it was filed more than fourteen days after Universe filed its answer to the Complaint, and Universe did not first obtain leave of court.  *See LeBrew v. Reich*, No. 03-CV-1832, 2006 WL 1662595, at *6 (E.D.N.Y. May 12, 2006), *report and recommendation adopted* (June 8, 2006) (dismissing the third-party complaint because "[e]ven assuming, *arguendo*, that" the third-party complaint was properly served, it is "untimely" because the third-party plaintiff "was required to make a motion for leave to file the third-party complaint, which he failed to do").

For these reasons, Universe must submit a letter, by December 1, 2025 (i) advising me whether it intends to voluntarily dismiss the Third-Party Complaint pursuant to Fed. R. Civ. P. 41 or (ii) demonstrating good cause why the Third-Party Complaint should not be dismissed pursuant to Fed. R. Civ. P. 4(m) for failure to request a summons and serve Lloyd and explaining any facts that would justify the late filing of the Third-Party Complaint without first seeking leave.

### C. *Remedies*

As Plaintiff is entitled to summary judgment on its § 1983 due process claim, I next consider Plaintiff's arguments that it is entitled to damages and declaratory relief.

### 1. **Damages**

Plaintiff argues that the appropriate measure of compensatory damages is (1) "loss of use damages," amounting to the monthly contractual payment to Santander for thirteen months (the length of time between the seizure and recover of the Vehicle from October 2020 to November 2021) and (2) prejudgment interest to account for the time period during which Plaintiff was deprived of the $4,100 it ultimately sold the Vehicle for, or $218.53.  (Pl. Mem. 23–24.) Plaintiff, however, is not entitled to summary judgment on its Fourth or Fifth Amendment claims, and does not submit a measure of damages corresponding to the Fourteenth Amendment claim on its own.  (*See id*.)  Moreover, the City asserts that Plaintiff could have mitigated its monetary damages if it recovered the Vehicle when it was first notified of the seizure in June 2021.  (Def. Reply 8.)  "Since the parties have not briefed the appropriate compensatory damages for Plaintiff's Fourteenth Amendment claim, I DENY summary judgment on the issue of compensatory damages.  Plaintiff may seek compensatory damages by separate motion." *Mercedes-Benz*, 770 F. Supp. 3d at 666.  "Of course, Counsel should confer to determine if they can agree as to these compensatory damages."  *HVT*, 2018 WL 3134414, at *15.

Plaintiff also seeks nominal damages, (Pl. Mem. 22), which Defendants do not respond to.  "Because the right to procedural due process is absolute, and because of the importance to organized society that procedural due process be observed," the Supreme Court has explained that "the denial of procedural due process should be actionable for nominal damages."  *HVT*, 2018 WL 3134414, at *15 (quoting *Carey v. Piphus*, 435 U.S. 247, 266 (1978)) (cleaned up).

Plaintiff is awarded nominal damages of $1 in connection with its Fourteenth Amendment claim. *Accord id*.

### 2. Declaratory Relief

Plaintiff also seeks a declaratory judgment that the City's Arterial Tow Program is unconstitutional "insofar as [the City] (a) does not provide notice to a lienholder until well after a vehicle's initial seizure and (b) does not provide for any adequate hearing, (c) results in retention of seized property beyond any legitimate law enforcement requirement to do so, and (d) results in an uncompensated taking when using seized vehicles to compensate a towing contractor (who returns part of the proceeds to [the City])." (Pl. Mem. 24) The Declaratory Judgment Act empowers federal courts to issue declaratory judgments. *See* 28 U.S.C. § 2201(a) (explaining that "any [federal] court . . . may declare the rights and other legal regulations of any interested party" that seeks a declaratory judgment). A court "may" exercise its discretion to issue a declaratory judgment, *id.*, considering "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citation omitted).

Because the Fourteenth Amendment requires Defendants to provide Plaintiff the opportunity for a hearing as part of the Arterial Tow Program, a declaratory judgment would "clarify[] or settl[e] the legal issues involved." *Id*. Specifically, as discussed *supra* § IV.A.2.b., a declaratory judgment would memorialize the process that Plaintiff is due. Courts in similar circumstances have reached the same conclusion. *See City of Yonkers*, 2024 WL 4817649, at *14 (granting declaratory relief determining a policy related to the handling of impounded vehicles seized pursuant to a driver's arrest did not provide sufficient due process protections (citing, *inter*

*alia*, *TD Auto*, 2023 WL 6295116, at *14; *Toyota Lease Tr.*, 2023 WL 4443992, at *12 (same for a city's Scofflaw program)); *Mercedes-Benz*, 770 F. Supp. 3d at 667 (same).  Thus, I will grant declaratory relief as to the Fourteenth Amendment claim following the parties' submission of additional briefing on this topic, *see supra* § IV.A.2.b.

## V.    <u>Conclusion</u>

For the foregoing reasons, the motions of the parties for summary judgment are GRANTED in part and DENIED in part consistent with this Opinion & Order.  Specifically: Plaintiff's motion for summary judgment is GRANTED as to Plaintiff's due process claim and is DENIED as to Plaintiff's Fourth and Fifth Amendment claims.  The City's motion for summary judgment is GRANTED as to Plaintiff's Fourth Amendment and Fifth Amendment claims, and is DENIED as to Plaintiff's due process claim.

IT IS HEREBY ORDERED that Plaintiff and the City meet and confer, and no later than December 1, 2025, submit a joint letter addressing:  (1) the appropriate amount of compensatory damages, if any, *see supra* § IV.C.1, and (2) the process Plaintiff is due so that the Arterial Tow Program is consistent with the Fourteenth Amendment, *see supra* §§ IV.A.2.b, IV.C.2.  If the parties wish, they may meet and confer and propose a briefing schedule for briefing on additional remedies for this case, *Mercedes-Benz Financial Services v. City of New York, et al.*, Case No. 21-cv-03908, *VW Credit, Inc. v. City of New York, et al.*, Case No. 22-cv-02310, and *VW Credit Leasing, Ltd. v. City of New York, et al.*, Case No. 23-cv-00856.

IT IS FURTHER ORDERED that Universe must submit a letter by December 1, 2025 (i) advising me whether it intends to voluntarily dismiss the Third-Party Complaint pursuant to Fed. R. Civ. P. 41 or (ii) demonstrating good cause why the Third-Party Complaint should not be dismissed pursuant to Fed. R. Civ. P. 4(m) for failure to request a summons and serve Lloyd and

explaining any facts that would justify the late filing of the Third-Party Complaint without leave,

*see supra* § IV.B.

The Clerk of Court is respectfully directed to terminate the pending motions at Docs. 59 and 66.

SO ORDERED.

Dated: October 29, 2025
          New York, New York

Vernon S. Broderick
United States District Judge